UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
        v.                         )        No. 4:11 CR 196 JCH / DDN
                                   )
KEVIN DONNELL WHITE, and           )
ROBBIN CROSKEY, et al.,            )
                                   )
                Defendants.        )

**ORDER AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The pretrial motions of the parties were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b).  Before the court are motions by defendants Kevin Donnell White and Robbin Croskey[1] (1) to dismiss the indictment, (2) for a bill of particulars, (3) to sever, (4) for pretrial discovery, and (5) to suppress evidence.  A pretrial hearing[2] before the undersigned was held on October 25, 2011.  Parties have filed post-hearing memoranda.

**(1) MOTION TO DISMISS INDICTMENT**

Kevin Donnell White has moved to dismiss the indictment as flawed by unlawful grand jury proceedings, as legally insufficient on its face, and for not being supported by legally sufficient evidence.  (Doc. 229.)

Defendant White is charged in Counts 1 and 4 of the indictment.  Count 1 alleges that White and the nine co-defendants violated 21 U.S.C. § 846 by conspiring to distribute and to possess with the intent to distribute cocaine, heroin, and marijuana in violation of 21 U.S.C. § 841(a)(1).

---

[1]Several pending motions also relate to defendant Samuel Johnson. (Docs. 91, 130, 131, and 193.)  However, the disposition of these motions must await the court's consideration of a pending evaluation,

[2]A transcript of the hearing was filed on December 13, 2011.  (Doc. 292.)

By a criminal information filed in this case on November 7, 2011, the United States alleges that defendant White (1) is charged by the present indictment with violations of 21 U.S.C. §§ 841(a)(1) and 846; (2) was convicted of felony drug trafficking on April 9, 1996 in the Missouri circuit court; (3) pled guilty in this federal district court on April 3, 1998 to felony conspiracy to possess with the intent to distribute more than two kilograms of cocaine; and (4) is subject to punishment of mandatory life imprisonment without release upon conviction on Count 1 in this case, pursuant to 21 U.S.C. § 841(b)(1)(A).  Copies of the alleged conviction records are attached to the information.  (Doc. 255.)

### Constitutionality of underlying statutes

White argues generally that the federal statutes upon which the alleged crimes are based are unconstitutional, i.e. 18 U.S.C. § 1956(a)(1)(A)(i) and (B)(i) and 21 U.S.C. § 841(a)(1).  (Doc. 229 at 2.) Regarding such an argued basis for relief, the court's Order Concerning Pretrial Motions, Doc. 81, provides:

> 3.   [I]f said motion [to dismiss an indictment or information] argues the subject indictment or information is based upon law(s) which is (are) illegal, void, or unconstitutional, the said motion shall specify the subject law(s) and the basis for said argument.

(Doc. 81 at 3.)  In support of his motion, defendant White only argues that the statutes alleged in the indictment

> are unconstitutional both on their face and as applied to the Defendant in that each violates the Due Process and Equal Protection Clauses of the United States Constitution, in that the said statutes and each of them are so vague, indefinite, overbroad, and uncertain to the extent that they fail to inform this Defendant and others similarly situated of exactly what conduct the legislature intended to prohibit and criminalize.

(Doc. 229 at 2.)  This argument does not sufficiently specify why defendant White believes the relevant portions of the statutes are unconstitutional.  Instead, this is an invitation to the court to survey relevant constitutional law for the specific standards and reasons why defendant should or should not prevail.  Without specific argument, supported by specific case and other citation to authority, joined with

meaningful argument by defendant, the undersigned has not, and the court ought not, undertake such a survey. See United States v. Garrett, No. 4:08 cr 703 ERW, 2009 WL 1086974, at *5 (E.D. Mo. Apr. 22, 2009)(summarily denying factually and legally unsupported challenges to the constitutionality of the statutes under which the defendant was charged).

<u>Grand jury proceedings</u>

White argues speculatively that the grand jury proceedings that led to the indictment against him were flawed for a myriad of generally stated reasons.  White states that this portion of his motion to dismiss is made protectively, to be perhaps amended following the court's ruling on his also-pending motion for pretrial discovery of grand jury materials, (Doc. 236.)  For the reasons set forth below, the court denies this motion for pretrial discovery of grand jury materials.  Because the myriad of allegations made by defendant White about the grand jury proceedings are entirely speculative, the undersigned recommends that they be denied on the pending motion to dismiss.

<u>Allegations in indictment</u>

White argues that the indictment is legally insufficient on its face.  To be legally sufficient on its face, the indictment must contain all the essential elements of each offense charged; it must fairly inform each defendant of the charges against which defendant must defend; and it must allege sufficient information to allow defendant to plead a conviction or an acquittal as a bar to a future prosecution. U.S. Const. amends. V and VI; Fed. R. Crim. P. 7(c)(1); Hamling v. United States, 418 U.S. 87, 117 (l974); United States v. Huggans, 650 F.3d 1210, 1217 (8th Cir. 2011).

Count 1

The essential elements of the Count 1 conspiracy to distribute drugs under 21 U.S.C. § 846 are: (1) a conspiracy, i.e., an agreement, to distribute the drugs or to possess them with the intent to distribute them; (2) that the defendant knew of the conspiracy; and (3) that the

defendant intentionally joined the conspiracy. United States v. Espino, 317 F.3d 788, 792 (8th Cir. 2003); accord, Eighth Circuit Manual of Model Jury Instructions (Criminal) § 6.21.846A.1 (2011), http://www.juryinstructions.ca8.uscourts.gov/crim_man_2011.pdf. Furthermore, for the purposes of Apprendi v. New Jersey, 530 U.S. 466 (2000), the indictment must allege "any fact that increases the penalty for a crime beyond the prescribed statutory maximum." 530 U.S. at 490; accord United States v. Aguayo-Delgado, 220 F.3d 926, 933 (8th Cir. 2000).

Count 1 has satisfied the constitutional requirement that it allege the essential elements of the offense. It specifically alleges the unlawful agreement and that defendant White knowingly and willfully participated in the agreement to traffic in the specified controlled substances. Count 1 also alleges that the conspiracy involved more than five kilograms of cocaine and more than one kilogram of heroin.

Count 1 also alleges enough information to inform him of the particulars of the offense against which he must defend. Besides the involvement of criminal activity occurring in this district, the indictment alleges that the conspiracy began in early 2009 and continued to the date of the indictment, May 19, 2011. Count 1 alleges the manner and means of the conspiracy in 26 paragraphs of factual allegations. Specifically regarding White, the indictment alleges that he is also known by four alias names, that he was involved in the conspiracy as a narcotics distributor and coordinator of the transportation of the drug proceeds, and that he repeatedly used a telephone to facilitate the distribution and possession of cocaine, heroin, and marijuana.

Defendant White argues in his motion to dismiss that the indictment fails to allege any specific place or times of the alleged offenses. The undersigned disagrees. The Count 1 conspiracy charge sufficiently alleges that from early 2009 to the date of the indictment (May 19, 2011) in this judicial district defendant White and the others agreed as described. United States v. Huggans, 650 F.3d at 1218.

White argues that the indictment does not allege how he committed any of the alleged offenses. The undersigned disagrees. Count 1 of the indictment alleges in the section captioned "MANNER AND MEANS OF THE CONSPIRACY" 26 actions of the conspirators. Among these paragraphs are

- 4 -

specific allegations against defendant White, that he served as the narcotics distributor and as a coordinator of the transportation of drug proceeds in the conspiracy, and that he repeatedly used a telephone to cause and to facilitate the distribution and possession of cocaine, heroin, and marijuana.  (Doc. 1 at 4.)  To be sufficient on its face, the indictment is not required to list the exact dates and places of the grand jury's allegations.  Huggins, 650 F.3d at 1218; United States v. White, 241 F.3d 1015, 1021 (8th Cir. 2001).

Count 1 is legally sufficient on its face.


## Count 4

Count 4 of the indictment alleges that White and co-defendants Viconto Lanorz Johnson and Robbin Croskey violated 18 U.S.C. § 1956(h) by conspiring to engage in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (B)(i).  Count 4 alleges the essential elements of a violation of § 1956(h) which are (1) an agreement to commit an offense defined in either § 1956 or § 1957;  (2) the defendant had knowledge of the agreement; and (3) the defendant knowingly became a party to the agreement.  18 U.S.C. § 1956(h).  There is no requirement that an overt act in furtherance of the alleged conspiracy be alleged.  Whitfield v. United Statest, 543 U.S. 209, 219 (2005).

The Eighth Circuit has held:

> A person violates section 1956 if he (1) engages in a "financial transaction" that (2) "involves the proceeds of specified unlawful activity," and (3) either engages in the transaction to "promote" further acts of specified unlawful activity or with knowledge of a design to conceal the nature, ownership, or control of the funds being laundered.  18 U.S.C. §§ 1956(a)(1)(A)(i) & (B).

United States v. Huber, 404 F.3d 1047, 1057 (8th Cir. 2005).

White argues that the indictment does not allege the means he used to commit the alleged money laundering.  The undersigned disagrees.  Count 4 alleges that defendant White conspired with the others from and during May 2010 through the date of the indictment (May 19, 2011) to buy vehicles for described drug trafficking, knowing the transactions were designed to conceal proceeds of unlawful drug trafficking.  (Doc. 1 at

- 5 -

8.)  More specific allegations of this conspiracy are not required for Count 4 to be legally sufficient on its face.  United States v. Mitchell, 613 F.3d 862, 865-66 (8th Cir. 2010); United States v. Helmel, 769 F.2d 1306, 1321-22 (8th Cir. 1985).

Count 4 is legally sufficient on its face.

Defendant Croskey argues that the government's pretrial production of information and evidence shows that its case against her is legally insufficient as a matter of law, that there is a variance between what is alleged in the indictment and the disclosed evidence, and that the charges against her should be dismissed prior to trial.  (Doc. 297 at 7.) Defendant is drawing conclusions from the government's pretrial disclosure of evidence that are not relevant to the pretrial posture of the case.

The defendant's entitlement to pretrial discovery of evidence is limited in many respects.  The government, generally, is required by the Constitution to disclose certain evidence that is favorable to the accused, Brady v. Maryland, 373 U.S. 83, 87 (1963); United States v. Bagley, 473 U.S. 667, 682 (1985); and evidence that could be used to impeach government witnesses' testimony, Giglio v. United States, 405 U.S. 150 (1972).  More relevant to defendant Croskey's argument, the government is not constitutionally required to make available to the defendant all the evidence in its file.  Kyle v. Whitley, 514 U.S. 419, 437 (1995).

Certain evidence is required to be produced before trial by Federal Rule of Criminal Procedure 16: the defendant's own oral and written statements; the defendant's prior criminal record; documents and objects material to the defense, or which the government intends to use in its case-in-chief at trial, or which had been obtained from or belong to the defendant; reports of examinations and tests; and a written summary of the expert witness testimony the government intends to use at trial. Fed.R.Crim.P. 16(a)(1).  The government is not required to disclose agents' prosecution reports and similar documents, other than is required by the Jencks Act, 18 U.S.C. § 3500; or grand jury materials other than is required by Rules 6, 12(h), 16(a)(1), and 26.2.  The court deals with defendant's request for disclosure of grand jury materials below.

- 6 -

On the motion to dismiss, defendant Croskey's arguments about the legal sufficiency of the government's disclosed evidence to support a conviction against her should not be decided as a matter of law before trial. Rather, this dispute should be decided during trial on motions for judgment or by jury verdict. United States v. Ferro, 252 F.3d 964, 967-68 (8th Cir. 2001) ("federal criminal procedure does not 'provide for a pre-trial determination of sufficiency of evidence'").[3]

Because the indictment is legally sufficient on its face, the court should not, on a pretrial motion to dismiss the indictment, further investigate to determine whether it is supported by legally obtained and sufficient evidence. United States v. Calandra, 414 U.S. 338, 344-45, 349-52 (1974); Costello v. United States, 350 U.S. 359, 363-64 (1956).

### (2) MOTIONS FOR BILL OF PARTICULARS

Defendant White has moved for a bill of particulars (Doc. 228), as has defendant Croskey (Docs. 195, 225). In response to the motion, the government states, and the record of statements by counsel during other court appearances in this case so indicate, that it has already provided defendants "liberal discovery" including "documents or reports specifying the particular details of the crimes alleged in the Indictment." (Doc. 242 at 2-3.)

Federal Rule of Criminal Procedure 7(f) authorizes the court to direct the government to file a bill of particulars. Fed. R. Crim. P. 7(f). A bill of particulars is used to inform the defendant of the nature of the charges with sufficient precision to enable defendant to reasonably prepare for trial, and to avoid or minimize the threat of unfair surprise at trial. United States v. Bowie, 618 F.3d 802, 817 (8th Cir. 2010).

---

[3]By separate order filed on January 4, 2012, the undersigned has denied the motion of defendant Croskey for leave to file a written affidavit of co-defendant White that purports to exonerate Croskey from criminal liability in this case. (Docs. 305, 305-1, 307.) Such information is not relevant to the issues presented by the pretrial motions these defendants filed.

As discussed above, the indictment is legally sufficient on its face and provides defendants White and Croskey with the constitutionally required notice of the charges against them.  To the extent defendants seek specific dates, times, and actions taken in furtherance of the conspiracy,[4] a bill of particulars is not intended to act as a discovery tool.  Huggans, 650 F.3d at 1220.  Nor is a bill of particulars "to be used to provide detailed disclosure of the government's evidence at trial."  United States v. Wessels, 12 F.3d 746, 750 (8th Cir. 1993).  Because "the government [has] explained its theory of the case, . . . already provided [defendants] with considerable discovery, . . . and stated that it [will] disclose more information about the witnesses before trial," a bill of particulars is not warranted.  United States v. Livingstone, 576 F.3d 881, 883 (8th Cir. 2009); see United States v. Trevino, No. 4:05 CR 690 RWS (FRB), 2007 WL 1174852, at *8 (E.D. Mo. Apr. 20, 2007) (noting that substantial discovery "obviates the need for a bill of particulars."); United States v. Ladoucer, No. 07-165 (ADM/JSM), 2007 WL 3396437, at *6 (D. Minn. Aug. 30, 2007) (denying motion for bill of particulars seeking the dates, times, and places of alleged wrongdoing), report and recommendation adopted by, 2007 WL 3051434 (D. Minn. Oct. 17, 2005).

Defendants have not shown how the lack of specific information would prejudice them.  United States v. Garrett, 797 F.2d 656, 665-66 (8th Cir. 1986).  Therefore, the motions of defendants White and Croskey for a bill of particulars are denied.

### (3) MOTION TO SEVER

Defendant White has moved to sever the charges against him for a trial separate from co-defendants (Doc. 234).  He argues that he was not properly joined with co-defendants in accordance with Federal Rule of Criminal Procedure 8.  At the hearing, defendant White asserted that the police report does not link him to other defendants.

---

[4]In her post-hearing reply to the government's memorandum, defendant Croskey argues that the government's pretrial disclosure of evidence and information has not set forth "the who," "the when," and "the where" of the offenses alleged against her.  (Doc. 291 at 2.)

In determining whether a defendant is entitled to a separate trial, the court must decide whether joinder (1) was proper under Federal Rule of Criminal Procedure 8, and (2) is likely to have a "substantial and injurious effect or influence in determining the jury's verdict." United States v. Lane, 474 U.S. 438, 449 (1986) (citation omitted).  Regarding the joinder of two or more defendants in an indictment, Rule 8 states:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).

"Rule 8(b) requires that there be some common activity involving all of the defendants which embraces all of the charged offenses even though every defendant need not have participated in or be charged with each offense." United States v. Bledsoe, 674 F.2d 647, 656 (8th Cir. 1982). The propriety of the joinder generally must appear on the face of the indictment.  Id. at 654-55; United States v. Wadena, 152 F.3d 831, 848 (8th Cir. 1998); United States v. Andrade, 788 F.2d 521, 529 (8th Cir. 1986).  "In general, persons charged in a conspiracy or jointly indicted on similar evidence from the same or related events should be tried together." United States v. Donnell, 596 F.3d 913, 923 (8th Cir. 2010) (citation omitted).

The court first looks to the language of the indictment to see whether the charges alleged against defendant White are part of the same acts or transactions, or series of acts or transactions, alleged against the other defendants.  Defendant White is charged in Counts 1 and 4.

Count 1 of the indictment charges all ten defendants with conspiring to distribute and to possess with the intent to distribute cocaine, heroin, and marijuana.  Count 4 charges defendant White and defendants Johnson and Croskey with conspiring to launder the proceeds of the sale of cocaine, heroin, and marijuana described in Count 1.  These charges pass muster for joinder under Rule 8(b) because Count 1 alleges common activity by all defendants, including defendant White, and Count 4

alleges three defendants, including defendant White, illegally used the proceeds of the illegal common activity charged in Count 4.

Moreover, regarding Count 1, the indictment alleges defendants used several vehicles to transport cocaine and marijuana from Arizona to the Eastern District of Missouri; defendants sold the cocaine and marijuana; the proceeds from these sales were used to facilitate further shipments; and defendants used cell phones in furtherance of their conspiracy. Count 1 further alleges defendant White was "a narcotics distributor and a coordinator of the transportation of drug proceeds in the conspiracy," and that defendant White "repeatedly used a telephone to cause and facilitate the distribution and possession with intent to distribute cocaine, heroin, and marijuana."

Based on these allegations, joinder of defendant White with co-defendants in the same indictment complied with Rule 8.

"Once defendants are properly joined under Rule 8, there is a strong presumption for their joint trial, as it gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." United States v. Flores, 362 F.3d 1030, 1039 (8th Cir. 2004) (citation omitted).  If joinder appears to prejudice a defendant, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires. See Fed. R. Crim. P. 14(a); Zafiro v. United States, 506 U.S. 534, 539 (1993); United States v. Boyd, 180 F.3d 967, 982 (8th Cir. 1999). However, there must be "severe or compelling" prejudice to grant severance. United States v. Pherigo, 327 F.3d 690, 693 (8th Cir. 2003).

Defendant White argues that severance under Rule 14 is necessary because he might be prejudiced by evidence that would otherwise be inadmissible against him and that the jury could have difficulty distinguishing the different charges and defendants.

Regarding defendant White's first argument, he has not identified what evidence, if any, will be introduced in his trial that would not be admissible against him and would thereby unfairly prejudice him. Moreover, severance is not warranted "simply because the evidence may [be] more damaging against one [defendant] than the others." United States v. Pou, 953 F.2d 363, 369 (8th Cir. 1992).  Nor is severance

- 10 -

required when evidence may be introduced that would not otherwise be admissible against a single defendant. United States v. Sparks, 949 F.2d 1023, 1027 (8th Cir. 1991).

White's second argument, that the jury will not be able to compartmentalize the evidence, is best determined at trial when the trial court can consider such factors as the complexity of the case, whether any of the defendants was acquitted, and the adequacy of limiting instructions and admonitions to the jury. Richardson v. Marsh, 481 U.S. 200, 211 (1987); United States v. Ghant, 339 F.3d 660, 665-66 (8th Cir. 2003); United States v. Sazenski, 833 F.2d 741, 745-46 (8th Cir. 1987).

At this pretrial stage of the proceedings, defendant White has not made a sufficient showing of prejudice to sever his case for a separate trial. Therefore, the court will deny defendant White's motion to sever without prejudice. Upon a sufficient showing of prejudice at trial, defendant White may refile his motion to sever.

## (4) MOTIONS FOR PRETRIAL DISCOVERY

### Investigative notes

Defendant White has moved for retention of the investigators' notes (Doc. 235). The government, while opposing production of the notes, has informed the investigators to preserve any existing notes. (Doc. 242 at 7-8.) See United States v. Leisure, 844 F.2d 1347, 1361 n.10 (8th Cir.), cert. denied, 488 U.S. 932 (1988). Therefore, this motion is moot.

### Grand jury materials

Defendant White (Doc. 236) and defendant Croskey (Docs. 197, 200, 220, 223, 224) have moved for disclosure and inspection of the grand jury transcripts and reports. Defendants argue that these materials may provide them with additional grounds to move to dismiss the indictment.

Under Federal Rule of Criminal Procedure 6, the court may authorize disclosure of a grand-jury matter "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). This means that a defendant must show that a "particularized need" exists for such materials before they can be

- 11 -

released. <u>United States v. Broyles</u>, 37 F.3d 1314, 1318 (8th Cir. 1994); <u>United States v. Warren</u>, 16 F.3d 247, 253 (8th Cir. 1994).

Defendants White and Croskey have not described a particularized need for the grand jury materials, nor have they raised any specific facts supporting their concerns. Defendant Croskey argues that the hearing testimony of Officer Lang showed that misleading statements were contained in the affidavit for the search warrant that authorized the search of 4440 Nazareth Hills Drive. She argues that for this reason "grounds may exist to dismiss the indictment against Defendant Croskey." (Doc. 257, at 4.) She also argues that the paucity of the government's pretrial disclosure of evidence against her may indicate that the information offered against her before the grand jury may have been legally insufficient to support the finding of probable cause in the indictment. (Doc. 297 at 2.)

These arguments are without merit. The hearing evidence indicated that DEA Special Agent James Stroop was the government's witness before the grand jury, not Officer Lang. Further, defendant Croskey's position is speculative ("grounds may exist"). Speculation that the grand jury process may have somehow been deficient is an insufficient basis for requiring disclosure of the grand jury proceedings. "[A] bare allegation that the [grand jury] records are necessary to determine if there may be a defect in the grand jury process does not satisfy the 'particularized need' requirement." <u>Warren</u>, 16 F.3d at 253.

Therefore, defendants' motions for disclosure of the grand jury materials are denied.

### Jencks Act materials

Defendant Croskey has moved for production of materials under the Jencks Act, 18 U.S.C. § 3500. (Docs. 196, 218). The court is without authority to compel the government to disclose Jencks Act materials at a time other than is set forth in the Act, 18 U.S.C. § 3500(b). <u>United States v. White</u>, 750 F.2d 726, 729 (8th Cir. 1984); <u>United States v. Matus-Beyliss</u>, 2008 WL 2568271 at *5 (E.D.Mo. 2008). The government has agreed to make Jencks Act material available to defendants on the Friday before trial. Therefore, defendant Croskey's motion is denied as moot.

- 12 -

## Confidential informants

Defendant White (Doc. 237) and defendant Croskey (Docs. 198, 221) have moved for disclosure of the identity of confidential informants. The government has agreed to disclose the identities of testifying witnesses, including confidential informants and their sources, prior to trial. (Doc. 242, at *5.) See Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1963). Therefore, these motions are moot.

## Favorable evidence

Defendant Croskey has moved for production of favorable, exculpatory, and impeaching information (Docs. 199, 222). The government has agreed to provide defendants prior to trial with copies of the criminal records of its witnesses and with any promises or agreements between the government and its witnesses. (Doc. 242, at *10); see Brady v. Maryland, 373 U.S. 83 (1963). The government has further agreed to produce witness statements, including grand jury testimony, pursuant to the Jencks Act. (Doc. 242, at *10.) United States v. Price, 542 F.3d 617, 621 (8th Cir. 2008) ("By the Jencks Act, after a government witness has testified, the court, upon motion of the defendant, shall order the government to produce any statement of the witness that relates to the subject matter of the testimony and is in the government's possession." (citation omitted)).

Therefore, defendant Croskey's motions for production of favorable, exculpatory, and impeaching information (Docs. 199, 222) are moot and will be denied.

## Pretrial discovery generally

At the scheduling conference on August 5, 2011, the court discussed the organization of discovery materials with defense counsel and counsel for the government. The court granted defendants additional time to review these materials and file pretrial motions, and ordered defense counsel to meet with counsel for the government not later than August 25, 2011 to resolve issues and complications regarding accessing information on the disks. The court also ordered the government to make certain

arrangements for defendants to listen to the taped materials.  Defendants have not filed additional motions concerning the organization of discovery materials provided by the government.

Defendant Croskey has moved to compel disclosure of certain recorded conversations between confidential informants and defendants in this case.  The government has offered access to these materials in its office; defendant seeks copies of these materials.  At the hearing on October 25, 2011, the court discussed this matter with defense counsel and counsel for the government.  The government stated that it has turned over all tapes except those with confidential informants and other defendants.  The court advised counsel for defendant Croskey that he could go to the government's office and listen to some of the tapes to see if any are helpful, and then file a motion if the government denies his request.  Defendant has not filed any such motion.  Therefore, this motion is moot.

Defendant Croskey has also moved pro se for discovery and inspection of evidence under Federal Rule of Criminal Procedure 16(a)(1) (Doc. 278).  This motion generally states the government's obligations for pretrial disclosure of evidence and seeks Title III wiretap conversations (see discussion of such evidence above).  This motion runs afoul of the court's Order Concerning Pretrial Motions (Doc. 81), which in this regard provides:

> [A]ny pretrial motion seeking a court order for the production of evidence or information from the opposing party . . . shall contain a statement of counsel that movant's counsel has personally conferred with counsel for the opposing party about the issue(s) raised in the motion(s), that there is a good faith belief that the information or evidence exists about which discovery is sought . . . , and that the disclosure of said information or evidence has been refused by the opposing party.

(Doc. 81, at *2.)  Defendant Croskey's pro se motion fails to state that either she or her attorney have specifically asked the government for disclosure of the specific information and evidence she seeks.  This motion is further without merit, because, as set forth above, the court directed the government and the defendants to confer and cooperate to provide such pretrial discovery.

- 14 -

### (5) MOTIONS TO SUPPRESS EVIDENCE

Defendants Kevin Donnell White (Docs. 67, 231, 233) and Robbin Croskey (Doc. 73) have moved to suppress evidence.  From the evidence adduced at the hearing held on October 25, 2011, the undersigned makes the following findings of fact and conclusions of law:

### FACTS[5]

1.    St. Louis Metropolitan Police Officer Robert Lang, assigned to the federal Drug Enforcement Administration Task Force, an experienced drug law investigator,[6] was a co-case agent in the investigation of Kevin White and Robbin Croskey for illegal drug trafficking.  White and Croskey came to Lang's attention during his investigation of Keith Williams' drug trafficking. The investigation of Williams included undercover buys, phone toll records analysis, and authorized Title III wiretaps on two of Williams's cell phones. From the analysis of phone use by White and Williams, investigators determined that their phone communications were related to drug trafficking.

### Pen register and trap and trace orders

2a.    On March 1, 2011, with investigative information provided by Officer Lang, Assistant United States Attorney Tiffany G. Becker applied to the undersigned for an order authorizing the use of a pen register and trap-and-trace devices, including enhanced caller identification, on the cell phone with number 314-791-1325 which was subscribed to by Kevin White at a specific address in St. Louis.   The application sought authorization to gather this information from March 1 through April 29, 2011.

---

[5]These findings of fact, especially those related to the contents of Title III wiretap affidavit of Officer Lang described below, are supplemented by other findings of fact expressed in the "Discussion" portion of this document.

[6]Det. Lang was then an experienced drug law investigator.  He had participated in many drug investigations; he interviewed confidential informants; participated in the execution of search warrants and the seizure of controlled substances and the proceeds of drug sales; and monitored Title III wiretaps.  He is familiar with the documents used by drug traffickers to record their activities.  He has monitored tracking and position location devices.

2b.    The basis for the application was the certification by AUSA Becker that

> the information likely to be obtained through the . . . pen register and trap-and-trace devices, including enhanced caller identification, is relevant to an ongoing criminal investigation by the agents/officer of the Drug Enforcement Administration . . . into possible violations of Title 21, United States Code, Section 841(a)(1), by Kevin WHITE and others unknown.

Case No. 4:11 MC 120 DDN, Doc. 1 at 1.

2c.    Although not stated in the application, the investigators believed that Kevin White was a source of cocaine for Keith Williams.

2d.    After considering the application, the undersigned issued an order authorizing the use of a pen register and trap-and-trace devices, with enhanced caller identification. <u>See</u> Case No. 4:11 MC 120 DDN, Doc. 2; Gov. Ex. 1.    Following the issuance of the Exhibit 1 order, the investigation continued.

## Title III wire interception

3.    Thereafter, Officer Lang prepared an affidavit of information about the investigation in support of the government's application for a court order authorizing the interception of wire communications[7] over a cell phone bearing number 314-791-1325.[8]    This information was submitted to Assistant United States Attorney Tiffany Becker.    AUSA Becker submitted the information to the Department of Justice.    On March 15, 2011, the Attorney General through his designees authorized applications for court orders for the interception of wire or oral communications over Target Telephone #3.    (Gov. Ex. 2.)

4.    The DEA investigation, prior to March 16, 2011, included the investigators' surveillance observations of what appeared at a distance

---

[7]The application was made pursuant to 18 U.S.C. § 2518, part of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522.

[8]This cell phone is described in the Title III affidavit, the Title III order, and this Order and Recommendation as "Target Telephone #3."

to be drug trafficking transactions involving Keith Williams and Kevin White.

     5a.   On March 16, 2011, AUSA Becker's written application for the court orders authorizing the interception of communications over Target Telephone #3 and Officer Lang's sworn, written affidavit were submitted to District Judge E. Richard Webber of this court. During the wiretap investigation of Keith Williams,[9] when investigators learned that Kevin White might be a source of drugs for Williams, sometime around the beginning of March 2010, Officer Lang began gathering information that was ultimately put into this affidavit. (Gov. Ex. 3.)

     5b.   Lang's affidavit described his expertise and training as a drug investigator, listed 18 individuals (including Kevin White and Robin (sic) Croskey) believed to be members of a drug distribution organization. (Id. at 1-4, ¶¶ 1-7.)

---

[9]The wiretap of Keith Williams' phone began on February 9, 2010.

5c.    The affidavit included information from prior and ongoing Title III monitoring[10] and from sources including checks of DEA indices;[11] a lengthy and specific description of the then ongoing investigation, the Title III interceptions of Kevin White while using the target telephone, quotations of the phone conversations in which Kevin White participated (with the agent's interpretation of the meaning of the cryptic or apparently innocent language used by White, Williams, and others that

---

[10]Paragraph 15 of the affidavit states:

Wiretap interceptions of **TARGET TELEPHONES #1 and #2, reveal that WILLIAMS is also utilizing Kevin WHITE, the user of** TARGET TELEPHONE #3, as an alternate source of supply for at least cocaine.

(Gov. Ex. 3 at 8, ¶ 15.)  Although not stated in the affidavit, the undersigned finds from the hearing testimony that the basis for this statement is the agents' interpretation of the speakers' language in calls over Target Telephones #1 and #2 as code for cocaine trafficking. The agents heard callers asking Williams whether "girl" (interpreted by the agents to mean cocaine) was available to buy.  Williams told the callers that it was not available.  Williams then was seen by agents to meet with Kevin White.  After meeting with White, Williams communicated by phone with persons believed to be drug distributors and told them that he was "ready," which the agents interpreted to mean that after meeting with Kevin White he had cocaine for distribution.  From their training and investigative experience, the investigators reasonably believed these facts indicated that White provided drugs to Williams for further distribution.

[11]Officer Lang's affidavit in the instant investigation stated that the investigation of Keith Williams began in July 2010 when DEA obtained information from a Confidential Source (CS#1) who stated that he/she had been buying heroin in St. Louis from Williams.  Thereafter, DEA acquired four more confidential sources (CS#2, CS#3, CS#4, and CS#5) who provided information about Williams's cocaine and heroin trafficking.  (Gov. Ex. 3 at 6, ¶ 9.)  This affidavit also stated that information about the reliability of these confidential informants was available in the Title III affidavit filed in the investigation of Williams and was "herein incorporated and available upon request of the Court."  Id. at footnotes 1 and 2.  Officer Lang testified during the suppression hearing, upon cross-examination by the defendant, that to his knowledge the issuing District Judge did not request the referenced information about the reliability of these informants.

- 18 -

indicated that the speakers were engaging in illegal drug trafficking).[12]

_____

[12]Officer Lang's and other investigators' interpretation of the language used in the monitored conversations to relate to drug trafficking was corroborated by investigators's subsequent surveillance observations of apparent drug trafficking activity by these subjects.

The affidavit described a phone conversation in which Williams agreed to meet White in-person at a carwash on February 12, 2011. About the meeting Officer Lang stated:

> Your affiant realizes that it is common place for sophisticated drug dealers to often times meet in person to discuss large scale sales and purchases. This is done in an attempt to thwart electronic monitoring from law enforcement.

(Gov. Ex. 3 at 8-9, ¶ 17.) From Officer Lang's testimony during the suppression hearing the undersigned finds that Williams and White met at the car wash, Williams made no attempt to have his car serviced there, although White's car was being detailed (serviced and washed) there at the time of the meeting. Thereafter, the agents intercepted phone calls that indicated that Williams had cocaine for distribution.

The affidavit describes an intercepted phone conversation of February 25, 2011, in which White called Williams and Williams said he was at a specific restaurant in the Central West End; they agreed to meet at the restaurant. (Gov. Ex. 3 at 9, ¶ 19.) Officer Lang testified at the hearing and the undersigned finds that investigators on surveillance saw White and Williams sit at a table in the restaurant with Kelvin Williams, whom investigators believed was involved in drug trafficking, and a fourth person who left the restaurant for a time until they summoned him back into the restaurant. The investigators reasonably believed that these circumstances indicated that White and Williams were talking about drug related business when the fourth person was away from the table.

The affidavit states that on February 26, 2011, following an intercepted phone conversation between White and Williams, the investigators saw Kevin White arrive at and enter the front door at 4234 West Page in the City of St. Louis. "Moments later, WHITE was observed leaving the residence." Id. at 11, ¶¶ 21-23. At the hearing, Officer Lang testified and the undersigned finds that 4234 West Page is the residence of Keith Williams. Officer Lang and the other investigators believed that White provided drugs to Williams at this time, at least in large part because 17 kilograms of cocaine were seized later that evening from the car that Williams drove to and from that residence, although Williams was not the driver of the vehicle when the kilograms were seized.

The affidavit states that on February 26, 2011 at 6:09 p.m. White called Williams and at the end of the conversation, "WHITE stated, 'Yep,

(Id. at 4-14, ¶¶ 8-30.)  However, in a sworn, written affidavit, dated February 9, 2011, filed in Cause No. 4:11 MC 72 to support an application for a Title III intercept order on another telephone in a different investigation by the DEA, Officer Lang stated that a conversation in which Kevin White participated had not been as yet intercepted.  Case No. 4:11 MC 72, Doc. 1-1 at ¶ 62.[13]  However, federal investigators in surveillance prior to February 9, 2011, saw White meet with Keith Williams in circumstances[14] that led the investigators to believe the meeting was regarding drug trafficking.

    5d.  The affidavit described the analysis of information obtained from the pen register device on Target Telephone #3.  Between March 3 and 11, 2011, Target Telephone #3 was involved in a total of 49 calls

---

alright I'll call you tomorrow man.'  WILLIAMS replied, 'Alright, I'll buy you lunch man.'" Id. at 12, ¶ 25.  In the affidavit Officer Lang stated in part that it was his opinion that the reference to lunch was to arrange for the purchase of more drugs.  Id. at 13, ¶ 25.

    The affidavit states that on March 2, 2011, a phone call was intercepted from Williams to White.  In the phone call, Williams stated that he was then walking with his son and others to lunch at a Thai restaurant.  Id. at 13, ¶ 27.  Officer Lang testified at the hearing that he believed that in fact Williams did have lunch with his family as indicated in the call.

    The affidavit states that during the afternoon on March 2, 2011, a phone conversation was intercepted in which Williams called White who said he was about to make two trips, the second one being "back that way" to "collect rent."  Officer Lang stated in the affidavit that he believed that "collecting rent" meant collecting money for previously delivered drugs.  Id. at 14, at ¶ 28.  At the hearing, Officer Lang testified and the court finds that White in fact owned approximately 6 rental properties.  However, the officer testified that he never saw White collect rent.  He also testified and the court finds that the statement about collecting rent referred to collecting "rent" from a woman and from Williams who did not rent from White.

    [13]At the evidentiary hearing, the undersigned took judicial notice of the records of the court regarding the affidavit in Case No. 4:11 MC 72.  See F. R. Evid. 201.

    [14]These circumstances included the length of the meeting and the fact that the meeting occurred on the parking lot of a restaurant without White and Williams entering the restaurant.  See also Case No. 4:11 MC 72, Doc. 1-1 at ¶ 36.

involving four other phones which were identified as being used by persons known to be involved in drug trafficking.  (Id. at 14-16, ¶ 31.)

5e.   The affidavit identified 16 people whose communications were expected to be intercepted.  These people included Kevin White, Keith Williams, and Robbin Croskey.  Regarding White, the affidavit described his criminal history of arrests, that White was involved in the installation of a large concealed compartment in a vehicle which was later stopped and found to contain 8 kilograms of cocaine, the interception of a telephone conversation in which White arranged a location for a meeting with drug trafficker Keith Williams, and the law enforcement observation of this meeting.  Regarding Croskey, the affidavit stated that Croskey had no felony arrests or conviction. However, law enforcement believed she used her vehicle sales business, Exotic Motors of Georgia, to facilitate the purchases of vehicles while concealing the true ownership of the vehicles for drug trafficking organization members. (Id. at 16-21, ¶ 32.)

5f.   The affidavit described the need for the wire communication interception.  It stated that the use of 9 different traditional investigative techniques either failed completely, had limited success, reasonably appeared unlikely to succeed if tried, or were too dangerous to use.  The affidavit specifically described why the use of the following investigative techniques would be unsuccessful:

(i)  Surveillance: due to attempted theft of surveillance equipment, use of counter-surveillance techniques, compromise of surveillance, inability to determine all the members of the drug trafficking organization being investigated, and the inability to confirm that White is using Thompson as a source of drug supply (Gov. Ex. 3 at 23-25, ¶¶ 35-40);

(ii)  Search warrants: due to the inability to determine the full extent of the drug trafficking organization (id. at 25-27, ¶¶ 41-45);

- 21 -

(iii) Confidential sources:[15] informants, and undercover agents, due to the current lack of contact with the full extent of the operations of the drug trafficking organization (id. at 27-28, ¶¶ 46-48);

(iv) Interviews[16] with targets, witnesses, and the use of the grand jury:[17] due to lack of information from persons due to fear of reprisals, invocation of the Fifth Amendment right to remain silent, attempts at service of subpoenas would cause witnesses to flee and become more careful in their activities (id. at 28-29, ¶¶ 49-51);[18]

(v) Electronic toll records: due to the lack of confirmation of drug trafficking relationship from telephone contacts, phone usage is usually short-term (id. at 30, ¶¶ 52-53);

(vi) Tracking devices: due to limited nature of the acquired information (id. at 31, ¶¶ 54-58);

(vii) Review of police records: due to the fact that they record only past information regarding contacts with police (id. at 32; ¶ 58);

(viii) Trash seizures: due to the lack of acquisition of direct evidence, the acquisition of information for search warrants only, lack of information of specific location sought (id. at 32-33, ¶¶ 59-62);

---

[15]Officer Lang testified that as of the date of this Title III application and his affidavit, he did not have a confidential source who was providing information about Kevin White.

[16]Officer Lang testified and the undersigned finds that as of the date of this affidavit the investigators interviewed several people none of whom could provide information. These interviewees did not include people the investigators believed were involved in the criminal activity for fear of compromising the investigation.

[17]Officer Lang testified at the hearing and the undersigned finds that as of the date of the affidavit no one was brought before the grand jury, and no one was offered or granted immunity by the government in exchange for his or her testimony.

[18]The affidavit further stated that one of the suspected sources of supply for Keith Williams was an "an unknown male, only identified as 'Demond' who is residing in Dallas, Texas." Gov. Ex. 3 at 7, ¶ 14. Officer Lang and TFO Biandolino decided not to interview Demond, because if Demond decided not to cooperate, Demond's knowledge of the investigation would compromise it.

(ix) Electronic surveillance, cellular location data, and precision location information: due to the limited nature of the information acquired (id. at 33, ¶ 63-64); and

(x) Prior Title III intercepts: due to the lack of information yet as to whether Thompson is White's source of cocaine (id. at 34-36, ¶¶ 65-71).[19]

5g.  The affidavit described the need for the interception to continue past the acquisition of the first relevant communication and to last for a period not to exceed 30 days or until the objectives of the investigation are achieved.  (Id. at 36-37, ¶¶ 72-75.)

5h.  The affidavit described the minimization procedures that would be followed, to make sure no legally privileged calls are monitored. (Id. at 37-38, ¶¶ 76-79.)

6a.  Thereafter, on March 16, 2011, Judge Webber issued an order authorizing the interception of wire communications over a Target Telephone #3. (Gov. Ex. 4.)  This order was based upon Officer Lang's affidavit, Government Exhibit 3.  In his order, Judge Webber found probable cause to believe:

(i)  The people named in the affidavit, described as target subjects, including Kevin White, Keith Williams, and Robin Croskey, were involved in unlawful drug trafficking, in violation of listed federal laws.  (Gov. Ex. 4, at 1-2, ¶ 1.)

(ii) Particular communications of one or more of the target subjects and others will be obtained through the authorized interception. (Id. at 2-3, ¶ 2.)

(iii) Target Telephone #3 will continue to be used in the commission of the described federal drug law violations and the location of Target Telephone #3 at times determined by investigators will either be evidence of these crimes or lead to evidence of these crimes.  (Id. at 3, ¶ 4.)

---

[19]Officer Lang testified and the court finds that by the date of this affidavit the investigators had no evidence that Kevin White spoke with another person in the presence of an informant, using clear, non-cryptic language, about transporting "drugs" in a specific vehicle.

6b.   Judge Webber's order stated his finding that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or would be too dangerous to employ. (Id. at 3, ¶ 3.)

7a.   On March 16, 2011, AUSA Becker issued a letter to Officer Lang and the agents who would monitor the interception of the communications over Target Telephone #3.   The letter contained 10 pages of guidelines and procedures to be followed in the execution of the court orders.   The procedures required the agents to be familiar with the contents of the related court orders, and to monitor and minimize interceptions as required by law and professional standards.

7b.   AUSA Becker's letter to the investigators, describing the minimization procedures to be followed for attorney-client privileged phone conversations, included the following:

> Attorney-Client Privilege: Agents should never knowingly listen to or record a conversation between a subject and his or her attorney when other parties are not present, unless the conversation is clear that the attorney is a participant in or is committing a crime.   Any time that an attorney is a party to a conversation, call the case agent immediately.   If it is determined that a conversation involving an attorney constitutes legal consultation of any kind, notify the case agent, shut off the monitor and stop recording, unless you are able to determine from the interception of any conversation involving an attorney that third parties are present who are not involved in the legal matters being discussed.   If such third parties are present, and only if they are present, you may intercept such conversations following the above-described rules of minimization.   In any event, notify the case agent immediately.

(Gov. Ex. 5 at 6.)

7c.   Thirteen agents, including Officer Lang, signed a certification that they had read and understood these guidelines.   (Gov. Ex. 5.)

7d.   Prior to this date, on February 9, 2011, Officer Lang received similar instruction about the legal requirements for executing Title III wiretap court orders, when involved in the related investigation of Keith Williams.   On that date, he and other investigators reviewed a similar letter with content similar to the March 16 letter.   Officer Lang

- 24 -

understood that the guidelines and procedures called for the minimization and marking as "privileged" of legally privileged communications.

8.     Officer Lang and the federal task force officers began their monitoring of communications over Target Telephone #3 on March 17, 2011.

9.     Sometime on or after March 17, 2011, in the execution of the instant wiretap authorization order, Officer Lang listened to a phone call ultimately determined to be from attorney Mike Owens, of the Pleban law firm, to Kevin White.  As soon as attorney Owens stated that he was an attorney with "Chet Pleban's office" and that he was "verifying an appointment for the following day," the investigators minimized this phone call by stopping monitoring and recording it.  Approximately 12 seconds of the call were monitored and recorded.  No communication of any substantial legal nature or legal advice was heard by the investigators.

10.     On March 28, 2011, AUSA Becker filed with the district court the FIRST 10-DAY REPORT OF THE UNITED STATES regarding the interception of communications on Target Telephone #3 from March 17 through March 26, 2011.  Attachment 1 to the report is a "tally sheet" that lists the number, type, and pertinence of each communication interception. Attachment 2 to the report summarized some relevant interceptions. Because the full scope of the criminal activities set forth in Officer Lang's affidavit had not been determined, the report requested that monitoring be allowed to continue until the objectives of the court orders were accomplished or the granted authority expired.  (Gov. Ex. 6.)

11.     On April 6, 2011, AUSA Becker filed with the district court the SECOND 10-DAY REPORT OF THE UNITED STATES regarding the interception of communications on Target Telephone #3 from March 27 through April 5, 2011.  Attachment 1 to the report is a "tally sheet" that lists the number, type, and pertinence of each communication interception. Attachment 2 to the report summarized some relevant interceptions. Because the full scope of the criminal activities set forth in Officer Lang's affidavit had not been determined, the report requested that monitoring be allowed to continue until the objectives of the court orders were accomplished or the granted authority expired. (Gov. Ex. 7.)

12.  On April 18, 2011, AUSA Becker filed with the district court the THIRD 10-DAY REPORT OF THE UNITED STATES regarding the interception of communications on Target Telephone #3 from April 6 through April 15, 2011.  Attachment 1 to the report is a "tally sheet" that lists the number, type, and pertinence of each communication interception. Attachment 2 to the report summarized some relevant interceptions. Because the full scope of the criminal activities set forth in Officer Lang's affidavit had not been determined, the report requested that monitoring be allowed to continue until the objectives of the court orders were accomplished or the granted authority expired.   (Gov. Ex. 8.)

13.  On April 18, 2011, AUSA Becker filed with the district court an application for a sealing order for one disk of wire communications intercepted from March 17 through April 15, 2011.  The application stated that the interceptions of conversations on Target Telephone #3 ended on April 15, 2011.  The application also stated that the investigation was continuing and that notification of the parties whose conversations were intercepted would alert them to the investigation.   (Gov. Doc. 9.)

14.  On April 18, 2011, District Judge Jean C. Hamilton ordered the sealing of the disk of recorded conversations and that notification of the intercepted parties be postponed until further order.  (Gov. Ex. 10.)

### Search warrant for 4440 Nazareth Hills Drive

15.  On March 28, 2011, federal Drug Enforcement Administration Special Agent James Stroop applied to Chief Magistrate Judge Mary Ann Medler for a search warrant to search 4440 Nazareth Hills Drive, St. Louis, Missouri, for drug trafficking evidence, including firearms and weapons.  (Gov. Ex. 11, Application.)  In support of the application, Agent Stroop submitted his written, sworn affidavit.  In his affidavit, he described his extensive experience and training as a drug law investigator.  The affidavit stated that 4440 Nazareth Hills Drive was the residence of Kevin White.  The affidavit described many consensual conversations and phone conversations involving drug traffickers under investigation, pursuant to the authorized wiretap monitoring.  The affidavit stated that on May 26, 2010, investigators saw Viconto

Johnson's vehicle and that of Kevin White parked outside 4440 Nazareth Hills Drive. On September 15, 2010, a blue Rav4 vehicle was seen parked in the driveway of 4440 Nazareth Hills Drive. The investigators had information that indicated the Rav4 would be equipped with a concealed compartment for transporting illicit drugs. On March 18, 2011, Kevin White was observed leaving 4440 Nazareth Hills Drive to meet with known drug traffickers Quentin Thompson and Viconto Johnson. Subsequently intercepted conversations involved White telling Tamecka Davis that he had obtained a BMW vehicle for her to have after she drives a Mercedes-Benz R350 to Arizona to pick up a quantity of drugs. On March 19, 2011, White and Davis met at a location near 4440 Nazareth Hills Drive. On March 28, 2011 a traffic stop and search of the Mercedes-Benz vehicle, then driven by Tamecka Davis,[20] yielded a discovery of 17 kilograms of cocaine and 2 pounds of marijuana hidden in the vehicle.[21] The affidavit stated that, in the experience of the investigators, drug traffickers use their residences to secrete contraband, proceeds of drug sales, and records of drug transactions and of people involved in drug trafficking. (Gov. Ex. 11, Application and Affidavit.) Based upon the application and affidavit, Judge Medler issued the warrant for 4440 Nazareth Hills Drive on March 28, 2011 at 8:40 p.m. (Id., Search and Seizure Warrant.)

16. The search of 4440 Nazareth Hills Drive was made on March 28, 2011 beginning at approximately 8:57 p.m. The execution of the warrant was commenced by a Raid Team. The Raid Team knocked on the front door of the residence and announced in a loud voice "Police. We have a search

---

[20]At the hearing, Officer Lang testified that the Mercedes-Benz R350 had been titled in the name of Tamecka Davis, but only as a "nominee" owner so that, if she was stopped by police in the vehicle and the title was checked, the officer would see that the car appeared to be properly titled in her name, in an effort to avoid suspicion that the car was involved in drug trafficking.

[21]Although not stated in the affidavit, Officer Lang testified that after she was arrested, Tamecka Davis was interviewed and she said she had met with Kevin White and that he had possession of the "trap" car before her trip to Arizona. She told the investigators that White took the car to a location unknown to her while she waited in his car. Davis never told Officer Lang that she had explicitly discussed drug trafficking with Kevin White.

- 27 -

warrant." Although they could see that someone was inside the residence, the officers received no response to the knock and announcement of their presence. After waiting 30 seconds, without any response having been made, the officers forced open the front door and entered the residence. The officers found two people inside the residence, Kevin White and Robbin Croskey. The residence was then searched. During the search White and Croskey were kept in a secure location.[22] Twelve categories of items were seized from the location. These items included US currency totaling about $360,000; many items of high value jewelry; a money counter; luggage with the name of another co-conspirator on it; vehicle titles; computers; and miscellaneous documents that showed that Kevin White resided there. (Gov. Ex. 11, Return.) The currency was found in several locations. One location was a crawlspace underneath steps that led from the first floor to the basement. In the crawlspace a large plastic bag was found which contained a large amount of money in rubber-banded stacks. Another location was in a night stand next to a bed. In the master bedroom was found a bag containing more stacks of rubber-banded money. Loose currency was located in the kitchen. From their training and experience, and their knowledge of the overall investigation, the officers seized the currency, because they reasonably believed the circumstances in which the money was found indicated that it was illicit drug sale proceeds. The officers seized items of jewelry because they were high value items which the officers believed were used to launder drug sale proceeds. Further, the officers believed that the relationship of the currency and the jewelry to drug proceeds was indicated by their knowledge that Kevin White did not have a known lawful source of income which would account for the large amount of currency and the expensive jewelry. No drugs or drug paraphernalia, other than a money counter, were found in the house. When the officers finished the search

---

[22]During the suppression hearing Officer Lang testified that, although he did not recollect that this occurred, another officer may have obtained pedigree information from Robbin Croskey during the search of the residence. AUSA Tiffany Becker, however, advised the court that the government would not offer into evidence in its case-in-chief at trial any March 28, 2011 statement made by defendant Robbin Croskey.

and departed the residence, they left a copy of the search warrant and a receipt for the items seized.  The search warrant and a copy of the inventory were returned to the court on April 7, 2011, by Agent Stroop. (Id.)

17.   Immediately following the search of 4440 Nazareth Hills Drive, Officer Lang placed Kevin White under arrest and told him he was being arrested for conspiracy to distribute drugs.  The factual basis for the arrest was the information learned about his and others' conspiracy to traffic in controlled substances, including the fact that his known lawful source of income could not account for the large amount of currency found in his residence at that time.

18.   Next, Kevin White was taken to the St. Louis division office of the DEA. He was not advised of his constitution rights at the house or on the trip to the DEA office.  No questions were asked of White at the house or on the trip and he made no statement to Officer Lang.[23]  At the DEA office, Officer Lang again told White that he was under arrest for conspiracy to distribute drugs.   He then read White his constitutional rights to remain silent and to counsel from a preprinted Advise of Rights form, Government Exhibit 12.  Officer Lang, with only Task Force Officer Mark Biondolino present, read the form aloud to White, including each statement of a right.  White understood each of his rights and indicated this by writing his initials next to each such statement. He signed the form at 11:40 p.m. on March 28, thereby indicating that he

---

[23]During the defense cross-examination of Officer Lang, questions and answers were expressed about whether Kevin White made statements to the officers on any topic.  Officer Lang testified that he did not intend to question White at all until they had gotten to the DEA office; therefore, he did not Mirandize White.  When asked whether White may have made statements before being advised of his rights at the DEA office, he testified that he did not recall any statements that related to the investigation being made by White until after he was advised of his rights at the DEA office.   During the suppression hearing, the undersigned addressed AUSA Becker and asked whether the government intended to offer in its case-in-chief at trial against White any pre-Miranda statement made by White to investigators.  Ms. Becker responded in the negative.  She stated that, because Officer Lang knows of no such statement, none will be offered at trial.

understood his rights and waived them, including his rights to remain silent and to counsel.  (Gov. Ex. 12.)

19a.   Thereafter, Officer Lang told White that the officers believed he was involved in a conspiracy and he asked White whether he wished to cooperate with the officers' investigation.  In response, White orally stated that he can get large quantities of drugs on the street and he is known on the street.  White also said that, in connection with speaking to law enforcement, he wished to speak with an attorney first.  As soon as White said this, Officer Lang stopped the interview.  Officer Lang asked White no more questions and advised White to speak with an attorney.  He gave White his and the other officer's phone number and asked that his attorney call the officers.

19b.   White made no written statement.   This interview was not recorded.  During the interview, Officer Lang never drew his weapon, made any statement or promise about cooperation, or threatened Kevin White.  During this interview, White never appeared impaired or anything but at ease with his surroundings.  White appeared to understand the questioning and the purposes for the Advice of Rights form.

20.   Next, Officer Lang filled out a "Prompt Presentment Waiver Form," Government Exhibit 13.  Lang explained the form to White, which stated his rights to remain silent and to counsel.  The form also advised that he understood that he had the right to be presented to a judge and that he would be released from police custody immediately.  Kevin White signed this form on March 28, 2011.  (Gov. Ex. 13.)

### DISCUSSION

#### Pen register and trap and trace orders

On March 1, 2011, in Case No. 4:11 MC 120 DDN, the government applied under 18 U.S.C. § 3122, for authority to use pen register and trap and trace devices, including enhanced caller identification, for phone number 314-791-1325 (Target Telephone #3) which was subscribed to by Kevin White.  After considering AUSA Becker's certification that White was the subject of an ongoing criminal investigation into illegal drug activities, the undersigned issued the order applied for.  (Gov. Ex. 1.)

The court's order complied with the requirement of 18 U.S.C. § 3123(b) that it be based upon the "certification . . . that the information likely to be obtained is relevant to an ongoing criminal investigation." 18 U.S.C. § 3122(b)(2).

The information acquired by the officers in the execution of this order should not be suppressed.

### Title III wire interception
#### a.  General principles

A federal District Judge may issue an order authorizing or approving the interception of wire or oral communications, upon a proper application of the United States.  18 U.S.C. § 2516(1).  The judge may issue the order if the judge determines that (1) there is probable cause to believe that an individual is committing, has committed, or is about to commit one of the crimes described in 18 U.S.C. § 2516; (2) there is probable cause to believe that particular communications concerning such an offense will be obtained through such interception; (3) normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or would be too dangerous; and (4) there is probable cause to believe that the facilities or the place from which the communications to be intercepted are being used, or are about to be used, in connection with the commission of such an offense, or are connected with the subject individual.  18 U.S.C. § 2518(3)(a)-(d); <u>United States v. Milton</u>, 153 F.3d 891, 895 (8th Cir. 1998).

#### b.  Probable cause

The nature of the probable cause showing necessary to support the issuance of a Title III order is the same as that required under the Fourth Amendment to support the issuance of a search warrant.  <u>United States v. Fairchild</u>, 189 F.3d 769, 775 (8th Cir. 1999).  "Specifically, probable cause is present if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime."  <u>Id.</u>; <u>accord</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 233-34 (1983) (rejecting rigid two-prong analysis of "veracity" and "basis of

knowledge" in favor of flexible analysis of reliability under totality of circumstances). In considering the probable cause showing, the court must construe the affidavit in a realistic fashion. The issuing judge's determination of probable cause should be accorded "great deference" by reviewing courts. United States v. Oropesa, 316 F.3d 762, 766 (8th Cir. 2003); Unites States v. Sundby, 186 F.3d 873, 875 (8th Cir. 1999) (considering only whether the judge had a substantial basis for finding probable cause). The probability, and not a prima facie showing, of criminal activity is the standard of probable cause. Smithson v. Aldrich, 235 F.3d 1058, 1062 (8th Cir. 2000). Probable cause affidavits are tested by much less rigorous standards than those governing the admissibility of evidence at trial. United States v. Bulgatz, 693 F.2d 728, 730-31 (8th Cir. 1982), cert. denied, 459 U.S. 1210 (1883); cf. United States v. Iron Cloud, 171 F.3d 587, 591 (8th Cir. 1999). A supporting affidavit must be viewed as a whole. Technical Ordnance, Inc. v. U.S., 244 F.3d 641, 649 (8th Cir. 2001); see also Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998) ("Applications and affidavits should be read with common sense and not in a grudging, hyper technical fashion.").

An informant's reliability, veracity, and basis of knowledge are relevant considerations--but not independent, essential elements--in finding probable cause. United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994). The basis of an informant's knowledge is not a prerequisite for probable cause, if probable cause is otherwise established or supported by other indicia of reliability. United States v. Anderson, 933 F.2d 612, 615 (8th Cir. 1991); see also United States v. Olson, 21 F.3d 847, 850 (8th Cir. 1994) (vents on the roof and abnormally high electricity bills corroborated informant's report of indoor marijuana growing).

In this case, District Judge Webber's order found probable cause to believe that Target Telephone #3, belonging to Kevin White, would continue to be used in the commission of the stated federal drug trafficking offenses. See Finding 6, above.

Defendant White argues that Officer Lang's affidavit is legally insufficient to support Judge Webber's findings of probable cause. The

- 32 -

undersigned disagrees.  Officer Lang's affidavit provided Judge Webber a substantial basis for finding probable cause to believe the facts required by 18 U.S.C. § 2518(3)(a)-(d).

The affidavit indicated probable cause to believe that Keith Williams used Target Telephones #1 and #2 in his substantial drug distribution business.  (Doc. Ex. 3 at 17, ¶ 32B.)  Investigators determined that Williams was getting cocaine from two sources, one in St. Louis and the other, identified as "Demond," in Dallas, Texas.  (<u>Id.</u> at 7.)

The affidavit also indicated probable cause to believe that Williams obtained cocaine from White.  The affidavit stated that interceptions over Target Telephones #1 and #2 indicated that Williams was using White as an alternate source of cocaine.  (<u>Id.</u> at 8.)  The affidavit stated that, although the use of Target Telephone #3 was limited (to make electronic surveillance less productive in an investigation), its use "facilitate[d] drug-related meetings to further the conspiracy between WILLIAMS and WHITE to distribute at least cocaine in the St. Louis, Missouri, area."  (<u>Id.</u>)

The affidavit stated that Williams's conversations with people to whom he distributes cocaine confirmed to the investigators that White provided cocaine to Williams.  (<u>Id.</u>)  To support this statement, the affidavit described phone calls over Target Telephones #1 and #3.  One call occurred on February 12, 2011.  That call set up an in-person meeting between White and Williams later that day at a carwash.  Williams joined White who was already there.  They met for a short time and then Williams left the area.  (<u>Id.</u> at 8-9.)  Two usages of Target Telephones #1 and #3 occurred on February 25, 2011, to set up a meeting at a restaurant.  The meeting occurred later that day between Keith Williams, his brother Kelvin Williams (another drug co-conspirator) and White.  The meeting involved Williams first motioning for a younger man to leave their company, which he did.  The meeting occurred, after which the younger man was called back to the restaurant.  (<u>Id.</u> at 10.)  The affidavit stated that on February 25, 2011, Williams got calls from persons the investigators believed wanted to buy drugs from Williams.  Williams told them in effect to wait because he was expecting a new

- 33 -

shipment of cocaine soon.   In a conversation on February 26 over Target Telephone #3 Williams in effect asked White for a delivery of drugs. White was followed to 4234 W. Page which he entered and then left moments later.   On February 27, 2011, Williams distributed drugs.   On February 28, White phoned Williams to confirm that the drugs previously delivered were all right.   (Id. at 10-13.)   Also relevant is the information that White had been identified in September 2010 as overseeing the installation of a large concealed compartment in a vehicle that was later stopped and found to be transporting approximately 8 kilograms of cocaine . . . ."   (Id. at 16.)

Defendant White argues that Officer Lang's affidavit submitted merely "baseless opinions, conjecture and speculation to the issuing judge" regarding whether White was even involved in drug activity merely because he was seen talking and having lunch with a drug suspect.   The undersigned disagrees.

Defendant White's argument is based upon his position that the affidavit describes only innocent intercepted conversations and actions by White.   However, in considering whether the affidavit established probable cause, Judge Webber was authorized to consider the informed opinions of the experienced Officer Lang[24] and the other investigators, and he could consider the facts and series of events, stated in Lang's affidavit, upon which the investigators's opinions were based.   Texas v. Brown, 460 U.S. 730, 742-43 (1983), United States v. Ryan, 293 F.3d 1059, 1062 (8th Cir. 2002)(holding a determination of probable cause does not depend on whether particular conduct is innocent or guilty, but on "the degree of suspicion that attaches to particular types of noncriminal activity").

### Franks v. Delaware

Defendant White argues that he is entitled to relief under Franks v. Delaware, 438 U.S. 154 (1978).   Under Franks, if the government

---

[24]Officer Lang's affidavit described his extensive training and experience in the investigation of drug crimes.   (Gov. Ex. 3 at 1-2.) See also footnote 6, above.

intentionally includes material false statements in its warrant affidavit, or includes material, false statements with that reckless disregard for the truth that is the legal equivalent of intentional falsehood, the reviewing court must "set aside those statements and then review the remaining portions of the affidavits to see if what remain[s is] sufficient to establish probable cause." United States v. Garcia, 785 F.2d 214, 222 (8th Cir.), cert. denied, 475 U.S. 1143 (1986). Defendants bear the burden of proving the intentional or reckless inclusion of false statements in a warrant affidavit. Id. at 222.

> [W]hen the defendant makes a substantial preliminary showing that a statement known to be false, or one made with reckless disregard of its truth, was included in an affidavit, then the Fourth Amendment requires that a hearing be held to determine whether the allegedly false statement was necessary to the finding of probable cause.

United States v. Buchanan, 985 F.2d 1372, 1377-78 (8th Cir. 1993); see also United States v. Engler, 521 F.3d 965, 969 (8th Cir. 2008). Entitlement to relief under Franks can be based upon the affiant's omission of a truthful statement. United States v. McIntyre, 646 F.3d 1107, 1113 (8th Cir. 2011).

As stated above, Officer Lang's affidavit expressly described the probable cause information about White's involvement in the drug trafficking under investigation and the use of Target Telephone #3 for this purpose as circumstantially related to Williams's and White's activities. The affidavit itself stated that White's use of the telephone superficially appeared to be innocent. (e.g., Ex. 3 at 8, ¶ 16.) But when the chronology of White's phone call conversations with Williams, their in-person meetings, and Williams's pre- and post-meeting phone calls with others, are considered in the lens of the investigators' training and experience in investigating drug trafficking, the affidavit provided a legally sufficient basis for a reasonable person to believe that White was using Target Telephone #3 in drug trafficking with Williams.

In his post-hearing memoranda, White argues that the suppression hearing testimony of Officer Lang[25] establishes both that the affidavit is a legally insufficient basis for the finding of probable cause and that the information in the affidavit is either false or was included with reckless disregard for whether the information was true or false.

Officer Lang testified generally in the suppression hearing that the officers' belief in White's drug trafficking relied upon the circumstances that Williams first told people he had no drugs to sell, then he would meet with White, and then Williams would contact people for the purpose of distributing drugs. (Trans., Doc. 292 at 109-10, 126-27.) The officers believed this in spite of the fact that in his monitored phone calls, White used innocent words. (Id. at 110.)

White, however, draws the court's attention to several portions of Lang's affidavit which he compares with Lang's testimony at the suppression hearing.

### The meeting at the carwash

White points to the following portion of Lang's affidavit that describes White's February 12, 2011 meeting with Keith Williams at a St. Louis carwash: "Based on training and experience you[r] affiant believes that Keith WILLIAMS met with Kevin WHITE at the carwash on N. Broadway to discuss purchasing an undetermined amount of cocaine from WHITE." (Gov. Ex. 3 at 9, ¶ 17.) However, the affidavit also states that this meeting was set up by phone call #105 over Williams's Target Telephone #1 and White's Target Telephone #3, which was monitored by the investigators. (Id. at 8.) Further, this portion of the affidavit also provided Judge Webber with the following information:

> Surveillance of this meeting showed WHITE and WILLIAMS engaged in a short conversation, and at the completion of the conversation WILLIAMS left the area. Surveillance observed WILLIAMS arrive at the carwash for the sole purpose of meeting with WHITE. Your affiant realizes that it is common place for

---

[25]The preliminary showing for entitlement to relief under Franks can be made by way of suppression hearing testimony, which is subject to the reviewing court's credibility findings. United States v. Buchanan, 985 F.2d at 1378.

sophisticated drug dealers to often times meet in person to discuss large scale sales and purchases. This is done in an attempt to thwart electronic monitoring from law enforcement.

(Id. at 9.)

Regarding the carwash meeting, Officer Lang testified at the suppression hearing consistently with the facts in his affidavit: that the agents had monitored a telephone conversation that set up the meeting at the carwash, that agents personally saw the in-person meeting between White and Williams at the carwash, that Williams made no attempt to have his car washed or otherwise serviced at that time, that White's car was then being washed, that when the conversation ended Williams left and thereafter made phone calls in which the investigators believed from their training and experience he said he now had cocaine to distribute. (Trans., Doc. 292 at 128.)

### The meeting at the restaurant

White points to the following portion of the Lang affidavit that relates to the February 25, 2011 meeting of White and Williams at a specific restaurant: "Based on training and experience, your affiant believes that Keith WILLIAMS, Kelvin WILLIAMS and Kevin WHITE all met at the restaurant in order to discuss in person the ongoing and future drug activities surrounding the WILLIAMS DTO [(Drug Trafficking Organization)], including the events which led to WHITE traveling out of the St. Louis area." (Gov. Ex. 3 at 10, ¶ 20.)

The affidavit, however, also provided more information to put this quotation in context. The affidavit described phone call #1779 at 12:20 p.m. on February 25, 2011, from Williams to White. In the call, they expressly ask about how each other is doing. Then White said he just got back in town. Williams then asked White if he wanted to come by. White said he would do so. (Id. at 9, ¶ 18.)

The affidavit also described phone call #1596 on February 25 at 12:28 p.m. in which Williams spoke with someone whom the investigators believed was calling Williams for drugs. During the conversation, Williams tells the person that he might know something in a minute and also "It's, it's gonna be alright. You hear me?" (Id. at 11, ¶ 23.)

- 37 -

The affidavit recounts phone call #1803 at 3:17 p.m. from White to Williams. In the call, Williams asked White where he was. White said that Williams knew White did not go far and asked Williams where he was. They arranged to meet at the restaurant. (Id. at 9, ¶ 19.)

The circumstances of the restaurant meeting between White and Keith Williams involved Kelvin Williams, a known drug trafficker, being included in the meeting. However, a younger man, believed to be Williams' son, was asked to leave the area until later when he was motioned to rejoin them in the restaurant. (Id. at 10, ¶ 20.)

During the suppression hearing, on cross-examination from defendant White's counsel, Officer Lang testified that the investigators and he speculated that While and Williams discussed drugs during the restaurant meeting. (Doc. 292 at 107-09.) This testimony is consistent with the information in the affidavit, i.e., including the information described below, to which the officers applied their expert knowledge and experience to understand that White was involved in drug trafficking. (Gov. Ex. 3 at 11, ¶ 23.)

## White visits 4234 W. Page

The affidavit describes phone call #2003 at 6:17 p.m. on February 26, 2011. In that call White agrees to and then is seen by the officers to travel to and enter 4234 West Page, and then leave "moments later." (Id. at 11, ¶ 22.) The affidavit described 4234 West Page as the residence of Keith Williams. (Id. at 17.)

Officer Lang testified at the suppression hearing that the officers knew that 4234 W. Page was Williams's residence and that White delivered drugs in that visit. (Doc. 292 at 129-30.) His opinion was reasonable in light of subsequent phone calls by Williams.

The affidavit described phone call #1965 on February 27, 2011 at 10:23 a.m., in which Williams is believed to be telling another person that he would have cocaine to sell, after he finished preparing it for sale, stating, "I just gotta get myself together alright . . . Yeah, hey listen I just gotta get together and clean myself up, alright." (Id. at 12, ¶ 24.)

### Later conversation

White points to the following portion of the affidavit in which Officer Lang merely speculates about drugs being the subject of a phone call: ". . . Your affiant believes that WHITE advised WILLIAMS that he would check with him tomorrow to see if he needed any more drugs and that WILLIAMS wanted to meet with WHITE in person again over lunch to arrange for the purchase of additional drugs." (Id. at 13, ¶ 25.) However, the basis of this opinion includes phone call #2526 at 6:09 p.m. on February 28, 2011, in which White follows up with Williams and Williams states "This is just like I thought it would, would be.  Yea, you know what I mean."  To which White said, "Yep, alright I'll call you tomorrow man." To which Williams said, "Alright, I'll buy you lunch man." (Id. at 12, ¶ 25.)

In the context of the investigation and known information, the agents reasonably believed that Williams and White were discussing drugs.

### The rent collections

White also compares Officer Lang's suppression hearing testimony with a portion of the affidavit that speculated about the use of the term "rent":  " . . . WHITE explained that he would be collecting money from WILLIAMS for the previously delivered cocaine when he told WILLIAMS that he would be 'back that way and collect my rent.'"  (Id. at 14, ¶ 28.) However, the affidavit states more completely, "WHITE replied, 'I'm, I'm gonna get rent from this girl and then I am going to come back that way and collect my rent.'"  To which Williams stated, "Alright, just call me." (Id.)

During the suppression hearing, Officer Lang testified that he knew that Kevin White owned rental property, a fact not stated in the affidavit.  However, Lang also testified that, to the investigators' understanding, White's and Williams's use of "rent" meant money for drugs, because the monitored conversation included White talking about collecting rent from Williams also and the officer knew that Williams was not renting property from White, and because no officer ever saw White collect rent from a female.  (Doc. 292 at 134-36.)

To be more complete, the affidavit might have included the fact that White owned rental property.  However, in the totality of what Officer Lang knew and put in the affidavit, the undersigned does not find and conclude that this omission was intentionally or recklessly deceptive. If the fact that White's ownership of rental property was relevant, so also was the officer's knowledge that Williams was not one of White's renters and that White had never been seen by an investigator collecting actual rent money from a female.

In the full context of the investigation, the language used in the monitored conversations was reasonably understood by the investigators to mean the collection of drug money by White.

### Reliability of Confidential Sources 2, 3, 4, and 5

Defendant White also points to the suppression hearing transcript of Officer Lang, Doc. 292 at page 121, line 6, to page 123, line 18, to establish his entitlement to a <u>Franks v. Delaware</u> hearing.  This testimony involved the facts that the issuing judge did not ask the government for the information about the reliability of Confidential Sources 1, 2, 3, 4, and 5.[26]

This segment of Officer Lang's testimony does not contradict the affidavit.  Lang testified that he was unsure whose confidential sources they were, whether his or his co-case agent.  (<u>Id.</u> at 121.)  However, the gist of this portion of the transcript involved defense counsel endeavoring to cross-examine the officer about the identities of the informants and what they knew, because they were mentioned in the affidavit.  The undersigned sustained the government's objection to this line of questioning, because, absent a showing sufficient to call into question defendant's entitlement to relief under <u>Franks v. Delaware</u>, the court is constrained to decide whether the wiretap order was properly issued by considering only the four corners of the documents presented to the issuing judge.  <u>E.g.</u>, <u>United States v. Tripp</u>, 370 Fed. Appx. 753, at *4 (8th Cir. 2010).  These portions of the record do not demean the

[26]<u>See</u> footnote 9, above.

basis for the issuing judge's finding of probable cause or the truthfulness of the information in the affidavit.

Officer Lang's affidavit described information provided by Confidential Source #1, that Keith Williams was "a principal leader of a DTO [(Drug Trafficking Organization)] operating in St. Louis, Missouri. Four additional confidential sources were acquired who provided additional information regarding Williams' cocaine and heroin distribution. (Gov. Ex. 3 at 6, ¶ 1.) The information from all five of the confidential sources was used in the affidavit to describe the basis for the initiation of the investigation of White and Williams. The affidavit uses information from many sources, including Confidential Sources 1-5, to establish that Target Telephone #1 is being used in drug trafficking. (Id. at 16-18, 27-28.)

However, the absence of the facts relating to these confidential sources' reliability and the absence of the specific information provided by Confidential Sources 1-5 do not detract from the conclusion of the undersigned, described above, that the affidavit was a legally sufficient basis for the issuing judge to find probable cause for the issuance of the wiretap order.

### c.  Specificity of the court orders

Title III requires that a government application and any issued wiretap order describe with particularity the nature and the location of the communication facilities involved in the wiretap, and also a particular description of the types of communications sought to be intercepted.  18 U.S.C. § 2518(1)(b), (4)(b), and (4)(c).

In this case the application and affidavit stated and the issuing judge found that the government expected to hear evidence in the wiretap of Target Telephone #3 about the drug trafficking under investigation. This specificity complied with the law.  United States v. Nguyen, 46 F.3d 781, 782 (8th Cir. 1995).

### d.  Necessity for the wiretapping

Defendants argue that the affidavit of Officer Lang failed to prove that other investigative procedures have been tried and failed or

appeared unlikely to succeed, if tried, or to be too dangerous, to justify the use of wiretapping. 18 U.S.C. § 2518(1)(c). The undersigned disagrees. The affidavit submitted to the district judge described the law enforcement objectives of the investigation, which were reasonable. The affidavit also demonstrated that several other-than-wiretap investigative techniques were used and had been helpful in the investigation.

The government is entitled to determine for itself the objectives of the investigation and to apply for wiretapping authority when other investigative techniques are reasonably considered insufficient to fully accomplish the investigative objectives. Each of the non-wiretap techniques are inherently limiting; they cannot provide the scope of evidence of criminal activity in real time as can a Title III wiretap. The close association of drug traffickers and their heightened sensitivity to surveillance limit law enforcement efforts in fully investigating them. Physical surveillance, pen registers, and telephone toll records of the persons investigated neither indicate the content of conversations nor obtain direct evidence of the alleged crimes.

The undersigned concludes that the officer's affidavit proved the inadequacy of other, usual investigative procedures. <u>United States v. Agrusa</u>, 541 F.2d 690, 694 (8th Cir. 1976).

<u>e. Minimization of intercepted conversations</u>

Title III requires that monitoring agents limit the interception of oral communications to those that are the proper subjects of the investigation. 18 U.S.C. § 1518(5); <u>United States v. Padilla-Pena</u>, 129 F.3d 457, 461-64 (8th Cir. 1997). As set forth above, the prosecutor's letter to the monitoring agents, the officer's testimony during the suppression hearing, and the ten-day reports all indicate that the monitoring agents complied with the minimization requirement.

Defendant White specifically argues that the agents failed to minimize a conversation they overheard between attorney Mike Owens, with the law office of Chet Pleban, White's defense counsel. The undersigned disagrees. As soon as the monitoring agents heard words that indicated that Owens told White that he was an attorney in Pleban's office and that

- 42 -

he was calling to verify an appointment for White to consult with the law office, the agents discontinued the monitoring and recording of it.  This occurred approximately 12 seconds into the call.  Defendant White has not identified any statement made by him that was recorded by the agents that would be helpful to the government's case against him.  The undersigned concludes that the monitoring agents minimized this conversation as required by Title III and by the written guidelines issued by AUSA Becker to the agents.

For these reasons, the motions to suppress the electronic evidence, including the defendants' recorded conversations, should be denied.

### Search warrant for 4440 Nazareth Hills Drive

Defendant White has moved to suppress the physical evidence seized pursuant to a federal search warrant from his residence at 4440 Nazareth Hills Drive.  He argues the warrant was not issued on probable cause. The issue before this court when reviewing the validity of the issuance of a search warrant under the Fourth Amendment is whether the supporting materials gave the issuing judge a substantial basis for concluding that probable cause existed for the issuance of the warrant.  United States v. Stevens, 439 F.3d 983, 987 (8th Cir. 2006) (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983)).  Probable cause means a "fair probability that . . . evidence of a crime will be found in a particular place," given the circumstances set forth in the affidavit.  United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999) (quoting Illinois v. Gates, 462 U.S. at 238).  See also, United States v. Grubbs, 547 U.S. 90, 95 (2006).

In this case, the Magistrate Judge issued a search warrant to search the residence for ten categories of physical items related to drug trafficking.  These items are set out on a document captioned "List" which was attached to Agent Stroop's application-affidavit and which was also attached to the search warrant.  (Gov. Ex. 11.)  Without specifically describing them, the undersigned concludes that the items described on the "Receipt for Cash or Other Items," which generally describes the items seized in the search, are all included in the ten categories of items authorized for seizure on the "List" document. (Id., Return.)

- 43 -

The affidavit provided the issuing judge a substantial basis for finding probable cause to issue the warrant.  The affidavit provided extensive information that established that Kevin White had been and was then involved in a very extensive drug trafficking operation.  The affidavit stated that 4440 Nazareth Hills Drive was White's residence, that vehicles involved in the drug trafficking operation under investigation were seen parked outside 4440 Nazareth Hills Drive, and that persons involved in the drug trafficking operation were seen in the vicinity of and coming out of 4440 Nazareth Hills Drive.  Finally, Agent Stroop's affidavit described the investigators' expert information that drug traffickers keep in their residences specifically described types of evidence of their illegal drug trafficking.

The motion to suppress physical evidence should be denied.

### Post-arrest statements of Kevin White and Robbin Croskey

Defendant White has moved to suppress any statements he gave to law enforcement after his arrest on March 28, 2011.  Defendant White was not interrogated at his residence or in the trip to the DEA Office. As set forth above, see Finding 18 n. 21, the government knows of no statement made by White at the scene of his arrest or on the trip to the DEA office to law enforcement or to anyone that the government would offer into evidence at trial.  Thus, the only statements at issue are the ones made by White at the DEA office.   He argues these statements should be suppressed.

To begin, the court concludes that the warrantless arrest on March 28, 2011 was lawful under the Fourth Amendment.  This is because the officers had probable cause for the arrest:  information sufficient to cause a reasonable person to believe that White either had committed an offense or was then committing an offense.  Beck v. Ohio, 379 U.S. 89, 91 (1964); United States v. Nevils, 897 F.2d 300, 309 (8th Cir.), cert. denied, 498 U.S. 844 (1990) (probable cause can be found in the information set forth in a search warrant affidavit).  This determination need not depend on individual facts, but may be based on the cumulative effect of the facts in the totality of the circumstances.  United States v. Brown, 49 F.3d 1346, 1349 (8th Cir. 1995).

In this case, the officers had probable cause to arrest Kevin White, because they had substantial information about his extensive involvement in the drug trafficking operation under investigation, plus the items seized from his residence pursuant to the search warrant.

White's post-arrest statements should not be suppressed. The government has the burden of establishing the constitutional admissibility of White's statements by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986); Lego v. Twomey, 404 U.S. 477, 489 (1972). Their admissibility depends upon whether the statements are constitutionally voluntary, Connelly, 479 U.S. at 163-67; and, when the statements are made during police interrogation while the defendant was in custody, as were White's, whether he had been advised of his Miranda rights, and, if so, whether he defendant knowingly and voluntarily waived his rights, North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979).

Statements are constitutionally involuntary if they are the result of governmental overreaching, such as physical mental or physical coercion, deception, or intimidation. Connelly, 479 U.S. at 167; Moran v. Burbine, 475 U.S. 412, 421 (1986); United States v. Jordan, 150 F.3d 895, 898 (8th Cir. 1998); United States v. Goudreau, 854 F.2d 1097, 1099 (8th Cir. 1988). Voluntariness is indicated by the officer giving Miranda warnings, United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996), and by the absence of threats or promises, Lovejoy v. United States, 92 F.3d 628, 633 (8th Cir. 1996).

White's post-Miranda statements were made by him after he was told why he was arrested and after he was orally and in writing advised of his constitutional rights to remain silent and to counsel. He understood his rights and he expressly waived them in writing when he signed the Waiver of Rights portion of the Advice of Rights form, Government Ex. 12. Thereafter, he made oral statements. No law enforcement officer threatened White, promised him anything, or in any way coerced him to get him to cooperate by making the statements he made. When White said he wished to speak with an attorney before he cooperated with the officers, the interview ended, no more questions were asked of him, and Officer Lang advised White to speak with an attorney. Michigan v. Mosely, 423

- 45 -

U.S. 96, 102-04 (1975)(invocation of right to remain silent must be scrupulously honored).  White then voluntarily signed a document waiving his right to be brought before a judge following his arrest and he was then released from police custody.

The motion to suppress White's statements should be denied.

The motion of defendant Robbin Croskey to suppress her statements should be denied as moot, because the government does not intend to offer in its case-in-chief at trial any statement made by Croskey on March 28, 2011.  See above at 27, n. 20.

### ORDERS AND RECOMMENDATIONS

For these reasons,

**IT IS HEREBY ORDERED** that

(1)  the motions of defendant Kevin Donnell White

(a)  for a bill of particulars (Doc. 228) is denied;

(b)  to sever (Doc. 234) is denied without prejudice;

(c)  for retention of investigative notes (Doc. 235) is denied as moot;

(d)  for disclosure and inspection of grand jury transcripts (Doc. 236) is denied.  and

(e)  for disclosure of the identity of confidential informants (Doc. 237) is denied as moot.

(2)  the motions of defendant Robbin Croskey

(a)  for a bill of particulars (Doc. 195, 225) are denied;

(b)  for disclosure of Jencks Act material (Docs. 196, 218) are denied;

(c)  for production and inspection of grand jury transcripts or reports (Doc. 197), for disclosure of grand jury matters (Doc. 200), for disclosure or inspection of grand jury records and proceedings (Doc. 220), and  for disclosure of grand jury information (Docs. 223, 224) are denied;

(d)  for production of confidential informants, informants, and cooperating individuals (Docs. 198, 221) are denied as moot;

(e)  for disclosure of favorable, exculpatory, and impeaching information (Doc. 199) is denied;

- 46 -

(f)    to compel disclosure of evidence (Doc. 205);

(g)    to withdraw from court consideration Docs. 195, 196, 197, 198, 199, and 200, which were filed on September 30, 2011 (Doc. 216) is denied;[27]

(h)    for release of Brady materials (Doc. 222) is denied as moot;

(i)    for leave to withdraw Doc. 257, "Defendant Croskey's Post-Hearing Memorandum in Support of Pre-trial Motions," (Doc. 274) is denied; and

(j)    for discovery and inspection pursuant to Federal Rule of Criminal Procedure 16(a)(1) (Doc. 278) is denied.

**IT IS FURTHER ORDERED** that the motions of the government for determinations by the court of the admissibility or not of arguably suppressible evidence (Docs. 91, 131) are denied as moot.

**IT IS HEREBY RECOMMENDED** that the motion of defendant Kevin Donnell White to dismiss the indictment (Doc. 229) be denied.

**IT IS FURTHER RECOMMENDED** that the motions of defendant Kevin Donnell White to suppress evidence (Docs. 67, 231, 233) be denied.

**IT IS FURTHER RECOMMENDED** that the motion of defendant Robbin Croskey to suppress evidence (Doc. 73) be denied.

The parties are advised they have until January 27, 2012, to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


_____/S/    David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on January 9, 2012.

---

[27]Except for the affidavit sought to be filed by defendant Croskey, see Docs. 305, 305-1, the undersigned has considered all documents filed on behalf of the defendants, whether by counsel or pro se.